UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EQUAL EMPLOYMENT OPPORTUNITY,
COMMISSION,

                    Plaintiff,

          v.

EVERDRY MARKETING AND
MANAGEMENT, INC.,
EVERDRY MANAGEMENT SERVICES,
INC. a/k/a EVERDRY WATERPROOFING
and EVERDRY OF ROCHESTER,

                    Defendants.

_____

<u>DECISION & ORDER</u>

01-CV-6329P

## <u>PRELIMINARY STATEMENT</u>

Pending before this Court are three motions for post-trial relief – one filed by

defendants (Docket # 196) and two filed by plaintiff, the Equal Employment Opportunity

Commission ("EEOC") (Docket ## 198, 203).  Defendants' motion seeks to amend or correct the

judgment on the grounds that the damages awarded to four claimants exceed the statutory

maximum under 42 U.S.C. § 1981a(b)(3).  (Docket # 196).  The EEOC has also moved to amend

the judgment, seeking to include prejudgment interest on the awards of compensatory damages

and lost wages.  (Docket # 198).  The second motion filed by the EEOC seeks an order of

injunctive relief against both defendants.

**A.  <u>The Trial</u>:**  The EEOC filed suit on behalf of thirteen individual claimants

against defendants, Everdry Marketing and Management, Inc. ("EMM") and Everdry

Management Services, Inc ("EMS").  EMM is an Ohio corporation that developed a system for waterproofing basements, which it franchises under the trademark "Everdry."  As the franchiser, EMM provides training and support to its franchisees relating to the operation of a waterproofing business; in return, franchisees pay EMM an initial franchise fee and monthly royalties.

EMS was also an Ohio corporation and was created to operate financially troubled Everdry franchises until a new franchisee could be found.  In the early 1990s, prior to the events giving rise to this suit, EMS assumed control of a franchise in Rochester, New York, and operated that franchise during the period relevant to this lawsuit, 1998 through 2002.  During that period, EMS hired employees, including telemarketers, and rented the office and warehouse space from which the Rochester franchise operated.  The thirteen claimants in this case were hired by EMS as telemarketers during the period at issue.

Commencing on October 10, 2006, a three-week jury trial was conducted before this Court.  During the trial, the EEOC presented evidence that defendants subjected female employees to physical and verbal sexual harassment.  Specifically, the EEOC offered testimony by, among others, the thirteen claimants, who recounted their various experiences working for EMS, during which male managers working for the defendants repeatedly grabbed and touched the buttocks and breasts of female employees, sucked the toes of female employees, made sexual propositions and comments, and told crude sexual jokes.  (Docket # 46).  Family members of several of the claimants also testified concerning the psychological effects of the harassment on the claimants.  Defendants offered testimony by other individuals who worked in the telemarketing room during the time in question and did not observe harassing behavior, as well as deposition testimony of several corporate officers.

2

Following trial, the jury returned a verdict in favor of the EEOC.  As to each of the individual claimants, the jury found that EMM and EMS acted as an integrated enterprise and had subjected the claimants to a sexually hostile working environment.  The jury awarded each of the thirteen claimants compensatory and punitive damages.  The amounts awarded in compensatory damages varied from a low of $4,500 (claimants Kyley O'Brien and Meghann Powell) to a high of $59,500 (claimant Anna Stevenson), and each claimant was awarded $20,000 in punitive damages ($16,000 against defendant EMM and $4,000 against defendant EMS).  In addition to compensatory and punitive damages, the jury also awarded $1,000 to claimant Stephanie DiStasio as lost wages based upon its finding that she was constructively discharged.  (Docket # 189).

**B.  The Post-Trial Motions:**  Oral argument was conducted on the post-trial motions on January 4, 2007.  Following argument, this Court determined that an evidentiary hearing was appropriate on defendants' motion to amend the judgment.[1]  That hearing was held on March 12, 2007, and Carl Moore, Operations Manager at EMM, testified for defendants.  The EEOC offered employee lists, but did not call witnesses.  Subsequent to the hearing, this Court issued a decision addressing issues pertaining to the EEOC's proof and permitting supplemental submissions.  (Docket # 246).  Both parties filed supplemental affirmations (*see* Docket ## 246, 248, 249, 250), and that motion, and the other post-trial motions referenced above, are now ready for determination.

---

[1]  The post-trial hearing was appropriate considering the absence of evidence in the trial record concerning the number of employees who worked at EMS and EMM – the single factor that determines the applicable statutory cap under 42 U.S.C. § 1981a(b)(3).

3

## DISCUSSION

### I. Legal Framework

Rule 59 of the Federal Rules of Civil Procedure permits a party to move to alter or amend a judgment entered pursuant to a finding by a jury. *See* Fed. R. Civ. P. 59(e). The decision whether to grant such a motion rests in the sound discretion of the district court. *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir. 1983). Relief is available under Rule 59 only if the movant can demonstrate "manifest errors of law or fact or newly discovered evidence that was not previously available." *Sugrue v. Derwinski*, 1993 WL 742742, *1 (E.D.N.Y. 1993) (citing *Wallace v. Brown*, 485 F. Supp. 77, 78 (S.D.N.Y. 1979)), *aff'd*, 26 F.3d 8 (2d Cir. 1994), *cert. denied*, 515 U.S. 1102 (1995).

Similarly, Rule 60 permits the court to relieve a party from a final judgment in the event of, among other things, mistake, inadvertence, excusable neglect, newly discovered evidence or fraud. Fed. R. Civ. P. 60(b); *see House v. Secretary of Health and Human Servs.*, 688 F.2d 7, 9 (2d Cir. 1982). According to the Second Circuit, however, relief under Rule 60(b) is "extraordinary" and may be granted "only upon a showing of exceptional circumstances." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986) (citations omitted). As with Rule 59, motions seeking relief under Rule 60 are "addressed to the sound discretion of the district court." *Id.*

### II. Statutory Cap Under 42 U.S.C. § 1981a(b)(3)

Defendants have moved to amend or correct the judgment on the grounds that the compensatory and punitive damages that the jury awarded to four claimants exceed the statutory maximum under 42 U.S.C. § 1981a(b)(3). (Docket # 196). Specifically, the claimants whose

awards are implicated by the motion are Stephanie DiStasio ($51,500), Lorraine Backus ($70,000), Anna Stevenson ($79,500) and Jennifer Zazzaro ($51,500).  The EEOC opposes the motion.  (Docket # 208).

      This particular motion was the subject of an earlier decision by this Court (the "February 19, 2008 Decision"), familiarity with which is assumed.  (*See* Docket # 245).  As that decision noted, the critical question under the statute is whether respondents had more than 100 employees "in each of 20 or more calendar weeks" in the year in which the complaining party worked or the preceding year.  If so, the statutory maximum for compensatory and punitive damages per claimant is $100,000 and the four awards at issue would be proper; if not, the statutory maximum per claimant is $50,000 and the four awards would need to be reduced to that amount.  *See* 42 U.S.C. §§ 1981a(b)(3)(A) and (B).

      **A.  The EEOC's Position:**  The EEOC maintains that defendants – considered together as an integrated enterprise – in fact employed more than 100 employees in the year 1999.[2]  This assertion relies exclusively on two employee lists produced by defendants during discovery – the first entitled "1999 Employee Master List Everdry Management Services" and the second entitled "1999 Employee Master List Everdry Marketing and Management" (together, "the Employee Lists").  From the Employee Lists, the EEOC compiled a chart that purported to

---

[2]  Both parties agree that 1999 is the appropriate year to examine.  According to the statute, the relevant time period is the calendar year in which the complaining party worked or the year preceding that one.  *See* 42 U.S.C. § 1981a(b)(3).  In this case, two of the four claimants whose awards are at issue (DiStasio and Backus) worked during 1998 and 1999; the third (Zazzaro) worked in 1999; and the fourth (Stevenson) worked during 2000 and 2001.  Thus, the calendar year 1999 is the appropriate time period to examine for all the claimants in order to determine whether their awards of damages exceed the statutory cap.

identify the EMS and EMM employees for each of 47[3] consecutive weeks in 1999, and submitted

that chart with its opposition papers. (*See* Docket # 208, Exhibit ("Ex.") C). In the February 19,

2008 Decision, I found that the EEOC's chart was "grossly inaccurate" and "unreliable." The

reasons for those findings are explained in detail in that decision.

The February 19, 2008 Decision permitted the EEOC "to review the Employee

Lists one final time to determine whether it persists in its belief that the lists do reveal 20 weeks

in which more than 100 employees worked" and, if so, "to file a post-hearing submission

identifying for each week in 1999 in which it contends that more than 100 employees worked,

the names of the employees, the page and line where each employee is identified on the

Employee Lists and the employment dates for all employees identified." (Docket # 246 at 6). In

response, the EEOC has submitted a revised chart and urges this Court not to disturb the four

awards. Defendants have reiterated their position that the awards should be reduced to the

statutory maximum of $50,000.

Based upon the Court's review and examination of the EEOC's revised chart and

the Employee Lists, the revised chart appears to summarize with substantial accuracy the

information contained in the Employee Lists. Having prepared the revised chart, the EEOC now

concedes that the critical issue "whether [d]efendants had more than 100 employees in 20 or

more calendar weeks in 1999 cannot be accurately determined . . . [from] [d]efendants' employee

lists." (Docket # 246 at 2). The explanation for this lack of clarity is that the Employee Lists

include over two dozen employees who were hired in or before 1999 and subsequently rehired,

---

[3] Through an apparent oversight, the EEOC's chart contained no data for the weeks after November 22-28, 1999.

6

but as to whom the Lists provide no information about the date their first tenure of employment

ceased. For example, the Employee Lists indicate that Kathleen Longdue was hired by EMS on

August 19, 1996, rehired on January 3, 2000 and terminated on May 12, 2000. Thus, it is

impossible to discern whether Ms. Longdue worked for any or all weeks in 1999. In sum, there

are twenty-four employees who fall within this category on the EMS Employee List[4] and two

employees in this category on the EMM Employee List. (*See* Docket # 246, Ex. A). The reason

that this category of employees is significant is that if they are not counted, the Lists show fewer

than 101 employees for 51 weeks of 1999; if they are counted, the Lists show more than 100

employees for 30 weeks of 1999.[5] (Docket # 246 at ¶ 6). Naturally, the EEOC urges that they be

counted, and defendants urge that they be discounted.

     **B.** **Defendants' Position:** Defendants' argument that the proof shows that fewer

than 101 employees were employed during 1999 is premised on various contentions: namely,

that (1) EMM and EMS should be considered separately and their employees should not be

aggregated; (2) the Employee Lists are unreliable and should not be considered competent proof

because no evidence was adduced to demonstrate how they were compiled or maintained;

(3) even if the Lists are considered, the employees in the category described above should be

disregarded; and (4) the Court should rely on the testimony of Carl Moore, Operations Manager

---

[4] Although the EEOC's chart correctly identifies twenty-nine EMS employees with rehire dates prior to their termination dates, five of those can be shown to have worked for identifiable periods in 1999 (Dade: 1/4/99-3/5/99; Goddrell: 1/1/99-4/23/99; Stanoevski: 1/1/99-1/16/99; Donavan: 1/1/99-12/31/99; Liese: 11/2/98-8/13/99). As to the others, some can be shown to have worked at some point in 1999 (because either their hire, rehire or termination date is in 1999) and some cannot (because their hire date is prior to 1999 and their rehire date after 1999).

[5] The EEOC erroneously maintains that the chart reflects 35 weeks during which more than 100 employees worked; the actual count on the EEOC's chart is 30 weeks. In addition, for the reasons outlines in footnote 7 on page 11, the true count is 23 after correcting for certain errors.

at EMM, offered at the post-trial hearing that no more than fifty to sixty-five employees worked

at EMS at any time in 1999 and no more than nine full-time and "a few part-time" employees

worked at EMM during that time.[6]

I reject defendants' first contention.  Considering the jury's determination that

EMM is liable under a theory that it operated with EMS as a single, integrated enterprise,

aggregating the two entities' employees for purposes of determining the applicable statutory cap

is appropriate.  *See, e.g.*, *Laurin v. Pokoik*, 2004 WL 513999, *4 (S.D.N.Y. 2004); *Smith v.

K & F Indus., Inc.*, 190 F. Supp. 2d 643, 647 (S.D.N.Y. 2002).

As to the second contention, I note that redacted versions of the Employee Lists

were admitted at trial as self-authenticating admissions of the defendants.  The Lists were

produced by defendants in response to requests by the EEOC for employee lists and records and

were admitted to show that certain individuals were employed both by EMS and by EMM.

(Docket # 227 at 1363-67).  Evidence of such employee overlap was relevant, in this Court's

estimation, to the question whether EMM should be considered the claimant's employer under

the integrated enterprise doctrine.  *See Regan v. In the Heat of the Nite, Inc.*, 1995 WL 413249,

*3 (S.D.N.Y. 1995) (question whether two entities shared employees is relevant to "interrelation

of operations" and "centralized control of labor relations," two of the factors to be considered in

determining whether two entities should be viewed as a single integrated employer).  While the

---

[6] In its motion papers, defendants also submitted sworn affidavits of John Sharpe, who worked as Head Confirmer and, subsequently, General Manager at EMS from December 1997 through April 2001, and Nicholas DiCello, who owned EMM and EMS during the relevant time period and still owns EMM.  Sharpe attested to his personal knowledge that EMS employed no more than sixty-five employees from late 1997 through August 2001. (Docket # 196-5 at ¶ 2).  DiCello attested to his personal knowledge that "at no time from 1998 through 2002" did EMS employ more than sixty-five full or part-time employees or did EMM employ more than twelve full or part-time employees.  (Docket # 196-6 at ¶¶ 2, 4).

Lists were admitted for that limited purpose, I need not resolve whether the Lists are competent evidence as to the separate issue of establishing the dates of employment of each employee because their admission does not affect the ultimate outcome of defendants' pending motion.

Thus, having rejected defendants' first contention and finding the second to be immaterial, I agree that determination of the number of employees turns largely on whether to include the employees in the category described above and whether, and to what extent, to credit Moore's testimony at the post-trial hearing.

**C.   The Post-Trial Hearing:**  At oral argument on the post-trial motions, counsel for both parties concurred that the EEOC, as the plaintiff, bears the burden of proof on the issue of the applicable statutory maximum.  Since the hearing, however, this Court has discovered that the majority of courts determining the issue of burden of proof hold to the contrary.  *See*, *e.g.*, *Mendez v. Perla Dental*, 2008 WL 821882, *4 (N.D. Ill. 2008) ("[d]efendants bear the burden of proof in establishing the number of employees . . . during the relevant time period"); *Dominic v. DeVilbiss Air Power Co.*, 2006 WL 516847, *4 (W.D. Ark. 2006) ("it is the defendant (and not the plaintiff) who has the burden of establishing the number of defendant's employees"); *Hamlin v. Charter Twp. of Flint*, 965 F. Supp. 984, 988 (E.D. Mich. 1997) ("the burden of establishing the number of employees is [d]efendants'").  The Second Circuit has not addressed the issue.

Regardless of which party bears the burden of proof on this issue in this case, my determination would be the same.  Both parties had a full and fair opportunity to present proof on the issue at the post-trial hearing, and both did so. In addition, the trial and post-trial records support the finding that any additional relevant employment records of EMS have been searched for and are apparently lost or have been destroyed.  Moreover, even if the EEOC's concession

that it bears the burden did not operate as a waiver or forfeiture of its right to argue to the

contrary now (which, to date, it has not), the EEOC could point to no prejudice from the parties'

and the court's misapprehension because I now accept that defendants bear the burden of proof.  I

simply find, for the reasons discussed *infra*, that defendants have met that burden.

At the post-trial hearing, the EEOC offered the Employee Lists, and the chart that

it had prepared based upon the Lists (which this Court subsequently found unreliable),

maintaining at that time that the Lists reflected the employment by EMS and EMM, taken

together, of more than 142 employees for all 52 weeks of 1999.  (Docket # 232 at 2).  Defendants

offered the testimony of Carl Moore, who was employed by EMM as Operations Manager.

Carl Moore testified that he was hired by EMM in 1989 and has held the position

of Operations Manager since that time.  In that role, he was responsible for supporting the

production operations of EMM's franchises, including EMS.  He testified that it was his practice

during that time frame to visit all the franchises at least once and often twice a year, and he

believes that in 1999 he visited EMS twice for two to three days each visit.  Based upon his

experience and personal observations, Moore testified that EMS's production department

employed between twelve and twenty-three people (depending upon whether there were two,

three or four crews); the sales department employed between two to five salespersons; the

telemarketing department employed between eight or nine and sixteen to eighteen telemarketers

(depending upon whether one or two crews were working); and five or six administrative and

management employees worked in the office.  In sum, according to Moore, during the periods

that four crews worked, EMS employed approximately fifty employees.  He explained that he

had estimated a maximum of sixty-five in his affidavit because he "was making sure that [he] couldn't be wrong."

       With respect to EMM, Moore testified that the number of employees has been relatively static over the years and totaled approximately seven to nine full-time employees and a few part-time employees during his tenure, including during the period 1998 to 2002.

       Moore also testified that he had searched for, but was unable to locate, payroll records for EMS, which has ceased doing business.

       **D.** <u>**Analysis:**</u>  To make a finding as to the number of individuals employed by EMS and EMM in 1999, I begin by noting the complete absence of any direct, let alone conclusive, proof establishing that number.  Even if the Employee Lists are credited, they do not prove that more than 100 employees worked for defendants for more than 20 or more weeks during 1999.  As previously explained, the inability to review the Lists and definitively ascertain the number of employees derives from the inclusion on those Lists of over two dozen individuals whose precise employment dates are not provided.  If they are included, and correcting for a few miscellaneous errors in the chart,[7] the chart shows 23 weeks during which more than 100 employees worked, of which seven weeks had the minimum of 101 employees necessary to trigger the $100,000 cap.  If those employees are discounted altogether, fewer than 101 employees worked during 51 of 52 weeks.

       I find it unreasonable to include all of the employees in that category or, as the EEOC has stated, to assume that their first date of employment "ran right up to their dates of

---

[7]    Specifically, the chart double-counts employee Michelle Trick (*see* Docket # 246, Ex. C at 1 and 2) and weeks 46-52 for employee Ronald Deffenbaugh (*id*. at 1) and erroneously includes weeks 1-43 for employee Alfonso Tolbert, who did not begin employment until November 1, 1999, week 44 (*id*. at 4).

11

rehire." (Docket # 246 at ¶ 6). If that were true, no need to rehire them would have existed.

Take, for example, Michelle Maira and Shaun Lewis. If one reasonably assumed that they were

not working the week before they were rehired, the number of weeks in which defendants

employed more than 100 employees would drop from 23 to 21. (*See* employees Jeremy Stull and

Charles Hanks). If one assumed that employees were unlikely to be working for EMS two weeks

prior to their rehire by EMS, the number of weeks shown on the EEOC's chart would drop from

23 to 19 (below the statutorily-required 20 weeks).

   I agree with the EEOC that the question of whether to count or discount this group

of employees turns to some degree on whether the EEOC or the defendants should assume the

risk of that lack of clarity in the Lists. On the one hand, resolving the uncertainty against

defendants reasonably accounts for the fact that they are in a better position as employer to

provide more precise employment information. On the other hand, the EEOC has had the

Employee Lists for a substantial period of time, as they were produced during discovery, and a

careful review of them would have revealed this issue. No additional pretrial discovery was

sought or conducted by the EEOC to clarify the issue. And now, of course, both sides confront

the fact that additional employment records from 1999 of an entity no longer operating (EMS)

apparently have been lost.

   Although resolution of this issue is a close one, I find that defendants have shown

by a preponderance of the evidence that they did not employ more than 100 individuals during 20

or more weeks of 1999. To reach a different conclusion would require the counting of

approximately a quarter of that figure (approximately twenty-five employees) whose precise

employment dates in 1999 are unknown and some of whom may not even have worked at all in

1999.  To assume that for all these individuals their first tenure of employment continued through the week preceding their date of rehire is too remote a possibility to reasonably credit.

My conclusion is buttressed, moreover, by Carl Moore's testimony.  Although he did not work regularly at the EMS facility, his testimony established his general familiarity with that office and its operations.  His testimony that no more than fifty to sixty-five employees worked at EMS during 1999, coupled with the affidavits submitted by John Sharpe, who did work in the EMS office in 1999, and Nicholas DiCello, lead me to conclude that fewer than 101 employees worked at EMS and EMM in 1999.  Accordingly, this Court grants defendants' motion to amend the judgments to reduce to $50,000 the compensatory and punitive damages awarded to claimants DiStasio, Backus, Stevenson and Zazzaro.

## III.  Prejudgment Interest

The EEOC seeks to amend the judgment to include prejudgment interest on compensatory damages and lost wages awarded to the claimants.  (Docket # 198).  While settled law permits such awards in Title VII cases, *see, e.g.*, *Loeffler v. Frank*, 486 U.S. 549, 557 (1988) ("Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers"); *Reiter v. Metropolitan Transp. Auth. of New York*, 2003 WL 22271223, *15 (S.D.N.Y. 2003) (court has discretion to order prejudgment interest on awards for emotional distress), the decision whether to do so is "ordinarily left to the discretion of the district court." *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998).  According to the Second Circuit, discretion to award prejudgment interest should be exercised in consideration of the following factors:

> (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

*Wickham Contracting Co. v. Local Union No. 3, IBEW, AFL-CIO*, 955 F.2d 831, 833-34 (2d

Cir.) (citations omitted), *cert. denied*, 506 U.S. 946 (1992).

As the parties recognize, the EEOC's motion raises two separate issues:  first, the appropriateness of prejudgment interest on an award of backpay; second, the appropriateness of prejudgment interest on awards of compensatory damages for emotional distress.  Considering first the $1,000 awarded in backpay to claimant DiStasio, this Court begins with the admonition by the Second Circuit that "it is ordinarily an abuse of discretion *not* to include pre-judgment interest" on judgments representing compensation for lost wages.  *Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371, 375 (2d Cir. 2000) (quoting *Gierlinger v. Gleason*, 160 F.3d at 873).  As the Court has reasoned, "[a]warding prejudgment interest . . . prevents the defendant employer from attempting to 'enjoy an interest-free loan for as long as it can delay paying out back wages[,]' and helps to ensure that the plaintiff is meaningfully made whole."  *Gierlinger*, 160 F.3d at 874 (quoting *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994)).  *See also Kuper v. Empire Blue Cross and Blue Shield*, 2004 WL 97685, *2 (S.D.N.Y. 2004) ("back wages represent a quantifiable loss not only in wages, but also in interest on those wages").  No persuasive reason has been offered by defendants, nor can this Court discern any, for departing from the general rule in favor of assessing prejudgment interest on backpay awards in this case.

14

Accordingly, I grant the EEOC's motion to amend the judgment to the extent it seeks to include prejudgment interest on DiStasio's award for backpay. The amount of prejudgment interest shall be calculated as follows:

> First, the award[] should be divided pro rata over the appropriate time period [in this case, the period from July 7, 1999 to September 1, 1999].[8] Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 will be applied. Third and finally, in order to guarantee complete compensation to the plaintiff, the interest will be compounded annually.

*Robinson v. Instructional Sys., Inc.*, 80 F. Supp. 2d 203, 208 (S.D.N.Y. 2000) (internal citations omitted)., *aff'd*, 259 F.3d 91 (2d Cir. 2001). The Clerk of the Court is directed to use this methodology to calculate the interest on DiStasio's backpay award and to amend the judgment to include that amount.

I reach the opposite conclusion, however, concerning the appropriateness of prejudgment interest on the emotional distress compensatory awards to DiStasio and the other claimants. As noted above, discretionary awards of prejudgment interest are designed to compensate fully the wronged party for actual damages suffered and to ensure fairness and the relative equity of the damages award. *Wickham Contracting Co. v. Local Union No. 3, IBEW, AFL-CIO*, 955 F.2d at 833-34; *see Reiter v. Metropolitan Transp. Auth. of New York*, 2003 WL 22271223 at *15 ("[u]nder Title VII, it is in a court's discretion to grant prejudgment interest on awards for pain and suffering and emotional distress, but courts have declined to do so when it is unnecessary to make the plaintiff whole"); *Robinson v. Instructional Sys., Inc.*, 80 F. Supp. 2d at

---

[8] This time frame represents the period between DiStasio's termination from EMS and the commencement of her next job. (Docket # 220 at 93-94; Docket # 221 at 36, 38).

15

207 (prejudgment interest appropriate "when interests of fairness and full compensation to the plaintiff so require"); *Perdue v. City Univ. of New York*, 13 F. Supp. 2d 326, 342 (E.D.N.Y. 1998) (awarding prejudgment interest in order to "make [the plaintiff] whole").   Unlike awards of prejudgment interest on backpay, awards of prejudgment interest on emotional distress damages is not the norm for New York federal courts.   *Kuper v. Empire Blue Cross and Blue Shield*, 2004 WL 97685 at *2 ("the majority of New York federal courts have declined to grant prejudgment interest on compensatory damages for mental anguish on the ground that such an award is not necessary to make the plaintiff whole"); *Zerilli v. New York City Transit Auth.*, 973 F. Supp. 311, 317 (E.D.N.Y. 1997) ("[i]n contrast to backpay awards, prejudgment interest is ordinarily not applied to awards of damages for pain and suffering"), *rev'd on other grounds*, 162 F.3d 1149 (2d Cir. 1998).

        In this case, I determine that prejudgment interest is unnecessary to make the claimants whole.   Here, the jury was specifically instructed that if it found either or both defendants liable as to any particular claimant, then it must award damages in an amount that would "fairly and justly" compensate the claimant for any damages the claimant sustained as a direct result of the defendants' conduct.   (Docket # 235 at 83).   Thus, the jury was directed to consider not only the harm suffered by the claimants at the time of the events in question, but also any continuing injury.   Indeed, several of the claimants testified that although they worked at EMS only for a relatively brief period, they continued to suffer from anxiety or nightmares as a result of the harassment they endured.   Unlike an award for backpay, which is limited to a finite period of time, the jury's award for compensatory damages accounted for any ongoing injuries or suffering found to result directly from defendants' conduct.   Because the amounts awarded by the

16

jury were designed to make the claimants whole, I find that a further award of prejudgment interest would be unnecessary and would represent a windfall to the claimants.  Accordingly, I deny the EEOC's motion to amend the judgment to include an award of prejudgment interest as to compensatory damages for emotional distress.


## IV.   Injunctive Relief

Consistent with the relief sought in its Complaint, the EEOC has filed a post-trial motion requesting the issuance of "an [o]rder for injunctive relief to prevent further unlawful conduct by Defendants in violation of . . . Title VII."  (Docket # 203).  The EEOC's proposed order, which is twenty-four pages in length, seeks broad relief, including (1) an injunction against defendants, "their successors, assigns, purchasers, and managers, officers and agents" prohibiting them from discriminatory acts on the basis of gender, as well as acts of retaliation against the claimants; (2) the adoption by defendants of written non-discrimination policies and procedures to be approved by the EEOC; (3) the appointment of a full-time "EEO Coordinator" to "coordinat[e] [d]efendants' compliance with anti-discrimination laws" and to "investigate and resolve all complaints of discrimination received by [d]efendants;" (4) training by outside contractors of all employees on the subject of all equal employment opportunity laws; and, (5) the hiring of an independent monitor to monitor defendants' compliance with the order of injunctive relief and to issue reports to the EEOC regarding that compliance.  (Docket # 203-3).  Defendants oppose the issuance of the requested order, arguing that it is unwarranted on the record before the Court.  (Docket # 209).

"Subsequent to a finding of unlawful discrimination or retaliation, the Court may enjoin a defendant from further unlawful practices 'if the moving party ... demonstrate[s] that there exists some cognizable danger of recurrent violations.'" *Collins v. Suffolk County Police Dep't*, 349 F. Supp. 2d 559, 563 (E.D.N.Y. 2004) (quoting *EEOC v. General Lines, Inc.*, 865 F.2d 1555, 1565 (10th Cir. 1989)) (other internal quotations omitted). The court's authority to order such injunctive relief is specifically provided for in Title VII:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, or . . . any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1). The discretion whether to do so must be "guided by sound legal principles." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975). "[T]he purpose of injunctive relief is to prevent future violations and the moving party must demonstrate that there exists some cognizable danger of recurrent violations, something more than a mere possibility, which serves to keep the case alive." *EEOC v. General Lines, Inc.*, 865 F.2d at 1565 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)). The likelihood of future violations should be evaluated upon the totality of the circumstances, including consideration of past illegal conduct. *Id.*

Based upon the trial record, I would easily conclude that injunctive relief against EMS is appropriate if EMS were still operating the Everdry franchise in Rochester. In this case, the jury found that all thirteen female claimants were subjected to sexual harassment at EMS at various times during a more than four-year period. This harassment included acts of physical

touching and grabbing – such as kissing, hugging, rubbing and the grabbing of their buttocks, sexually explicit stories, unwelcome inquiries relating to the claimants' intimate lives, and repeated sexual jokes and comments.  Many of the claimants were teenagers, and their harassers included telemarketing managers, as well as three general managers of EMS.  Although the trial evidence was limited to the four-year period between 1998 and 2002 when the claimants were employed, the pervasiveness and egregiousness of the offensive conduct during that lengthy period of time permits me to confidently and reasonably infer the likelihood of future violations if EMS continued to operate.

That otherwise appropriate exercise of discretion is inappropriate, however, because the post-trial record demonstrates that EMS is no longer a viable operating entity.  As the record establishes, on August 2, 2004, EMS sold the Rochester Everdry franchise to JM Romich Enterprises, Inc. ("JM Romich") and thereafter ceased doing business.[9]  Recognizing that no legitimate purpose may be served by issuing an injunction against an entity that no longer operates, I decline to grant the EEOC's motion as to defendant EMS.  *See Chellen v. John Pickle Co., Inc.*, 446 F. Supp. 2d 1247, 1290 (N.D. Okla. 2006) (denying EEOC's post-trial request for order imposing broad injunctive relief against company found liable under Title VII because "the EEOC has failed to show anything more than a mere possibility of recurrent violations given the

---

[9]  Counsel for EMM has submitted, and this Court has reviewed, the asset purchase agreement entered into on August 2, 2004 by EMS as seller and JM Romich Enterprises, Inc. as buyer.  The agreement provides that "[b]uyer shall not assume any debts, liabilities and/or obligations of the [s]eller" with certain exceptions not relevant to this matter.  (Docket # 251, Attachment 1 at ¶ 3).

In addition, EMM's President submitted a sworn affidavit in connection with the motion affirming that the sale occurred on August 2, 2004, that EMS ceased doing business in 2004, and that there was no continuity in officers, directors or shareholders between EMS or EMM, on the one hand, and JM Romich, on the other.  (Docket # 251, Attachment 3).

complete cessation of operations by [defendant]").  *See also Albemarle Paper Co. v. Moody*, 422

U.S. at 418; *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1230 (10th Cir.

1997) ("the moving party must satisfy the court that relief is needed") (quoting *United States v.

W.T. Grant Co.*, 345 U.S. at 633); *see also General Lines Inc.*, 865 F.2d at 1565 ("the moving

party must demonstrate that there exists some cognizable danger of recurrent violations").

        In view of the evidence that EMS sold its assets to JM Romich and is no longer

doing business, let alone operating an Everdry franchise in Rochester, the EEOC appears to have

reframed its request for injunctive relief.  Instead of (or perhaps, in addition to) seeking relief

against EMS, the EEOC now seeks an order requiring the implementation of injunctive relief "at

the Everdry location in Rochester."  (Docket # 253).  Such relief could be implemented only

through an order directing the implementation of the requested measures by an entity or person

with ownership or control over that location – namely, JM Romich or possibly EMM.  Each will

be discussed in turn.

        The papers that the EEOC has submitted in connection with this motion do not

clearly establish whether it is actually requesting that this Court issue an Order directed at

JM Romich.  Certainly, the EEOC has argued vigorously that "JM Romich meets the standard for

successor liability."  (Docket # 253 at 3).  On the other hand, it has acknowledged that the

"EEOC has not yet moved to join JM Romich in this case as the successor in interest to EMS in

Rochester."  (*Id*.).  The failure to join JM Romich as a party in this lawsuit, or at least to serve it

with notice of the proposed injunctive order so that it could participate in the proceedings related

to the motion, presents a jurisdictional bar to the entry of an order requiring or enjoining any acts

by JM Romich "at the Everdry location in Rochester," even if successor liability could be

established.  *See* Fed. R. Civ. P. 65(d) (an injunction binds only the parties; their officers, agents,

servants, employees, and attorneys; and "other persons who are in active concert or participation

with [them]").  *See also SEC v. Platinum Investment Corp.*, 2004 WL 759512 (2d Cir. 2004);

*O & L Assoc. v. Del Conte*, 601 F. Supp. 1463 (S.D.N.Y. 1985).

Finally, I also decline to issue an injunction against EMM because I find that such

relief is not warranted on the facts before this Court.  The jury found that EMM was liable to the

thirteen claimants for acts of sexual harassment committed at the EMS workplace.  The jury's

finding of liability was based upon the theory that EMM and EMS acted as a "single, integrated"

employer of the claimants, even though the claimants were directly employed by EMS.

In determining whether to exercise my discretion to issue an injunctive order

against EMM, the following facts are salient.  EMM's office is located in Ohio, where it is in the

business of selling and operating waterproofing franchises under the mark "Everdry."  No

evidence was presented that any acts of harassment occurred at the EMM office in Ohio or that

any EMM employees were subjected to sexual harassment or discrimination at the Ohio location

or anywhere else.  None of the claimants were employed by EMM; they were employed by EMS,

and none currently works at EMM or the Rochester franchise (now operated by JM Romich).

In addition, EMM has submitted sworn affidavits attesting to the absence of any

overlap between officers, directors, or shareholders of JM Romich, on the one hand, and either

EMM or EMS, on the other.  (Docket # 251, Attachments 3 and 4).  EMM and JM Romich have

no employees in common; and, the record is devoid of any evidence concerning whether and, if

so, to what extent individuals who were employed by EMS before the sale continued in

employment with the Rochester franchise after the sale.  As far as this Court can ascertain, none

of the harassers who worked at EMS are employed by JM Romich and, as noted above, none of the victims work there.

Considering these facts and the change in ownership and management at the Rochester location, I find that the likelihood of future violations there is remote. *See Reiter*, 2003 WL 22271223 at *15 (denying post-trial motion for permanent injunction in Title VII case; noting supervisor who had retaliated against plaintiff no longer worked at company and absence of showing that plaintiff would be retaliated against). Thus, even if I were to accept the EEOC's argument that EMM has sufficient control over JM Romich's operations in Rochester to effect any injunctive measures ordered, I do not find such measures to be justified by any genuine danger of recurring harassment at that location. *See Albemarle Paper Co.*, 422 U.S. at 418; *General Lines Inc.*, 865 F.2d at 1565.

Accordingly, I deny the EEOC's motion for injunctive relief.

## CONCLUSION

For the foregoing reasons, it is my Decision and Order that defendants' motion to amend the judgment pursuant to 42 U.S.C. § 1981a(b)(3) **(Docket # 196) is GRANTED**. The Clerk of the Court is directed to reduce to $50,000 the awards of compensatory damages made to claimants DiStasio, Backus, Stevenson and Zazzaro.[10]

It is my further Decision and Order that the EEOC's motion to amend the judgment to include an award of prejudgment interest **(Docket # 198) is GRANTED in PART**

---

[10] Although a proportional reduction in compensatory and punitive damages is usually appropriate, a reduction of only the compensatory damages is appropriate here in order to ensure the uniformity in the punitive damage awards of $20,000 that the jury made to all claimants.

**and DENIED in PART**.  The Clerk of the Court is directed to amend the judgment by including

prejudgment interest to the award of lost wages to claimant DiStasio.  The Clerk is directed to

utilize the methodology outlined herein on page 15, *supra*.

    Finally, it is my Decision and Order that the EEOC's motion for injunctive relief

**(Docket # 203)** is **DENIED.**

**IT IS SO ORDERED.**


          *s/Marian W. Payson*
          MARIAN W. PAYSON
          United States Magistrate Judge

Dated: Rochester, New York
       May   30  , 2008

23